## John P. Rackliff *vs.* Arthur I. Rackliff.

### Franklin.    Opinion March 7, 1902.

#### *Water.    Diversion.    Deed.*

In an action for the diversion of water from plaintiff's mill, situated upon Muddy Brook stream, below the mills and dams of defendant, it appeared that in 1860, S. B. Philbrick became the owner of a tannery and a lot of land of about two acres on the east side of the brook. His deed was bounded by the easterly side of the stream, which excluded all common law rights in the stream as riparian proprietor. This deed granted to him "the right to draw water from the upper dam (at outlet of pond) when there is more than three and one-half feet of water in the flume, for the use of all tanning purposes."

*Held;* that this grant is limited to a particular use—that of tanning purposes, and is not a measure of power.

1868, Hinkley, who then owned all the water rights at the outlet of the pond, and on the stream, together with the land on both sides, except the tannery lot, conveyed to Waugh the premises now owned by the plaintiff, which included the lower dam and saw-mill and mill pond to the same. This dam was nearly five hundred feet below the dam next above it. In that deed was granted "the right and privilege to draw and use water from Clearwater pond sufficient to carry one wheel in said saw-mill for the purpose of manufacturing timber," etc., "meaning one of the wheels now in the said mill or any other wheel venting or requiring no more water to carry it. Said water to be taken through the dam, flumes and pond of the other mills on the stream above the saw-mill."

On December 1, 1900, defendant was the owner of the tannery lot, the dam at the outlet of the pond, and all the land on both sides of the stream from the pond to plaintiff's land, with the mills thereon, and all water rights thereto appertaining, except the right which plaintiff had as derived under the Waugh deed. He erected upon the tannery lot a saw-mill, and used water to propel it.

*Held;* that the union of absolute title to the tannery lot, with all the other land on both sides of the stream above plaintiff's land, extinguished the easement in the tannery lot. Thenceforward the defendant, as riparian proprietor, had the right to the reasonable use of all the water of the stream, subject only to the right plaintiff derived under the Waugh deed.

The plaintiff did not claim that he has been deprived of the water granted under that deed, and therefore has suffered no damage.

A— CLEARWATER POND.
B— MUDDY BROOK STREAM.
C— GRIST MILL.
D— STARCH FACTORY.
E— DAM.

F— DAM.
G— DAM.
H— SAW MILL.
I— TANNERY.
J— TANNERY LOT.

On report.　Judgment for defendant.

Action on the case for diversion of water.

The facts appear in the opinion.

*Frank W. Butler*, for plaintiff.

*J. C. Holman* and *H. Hudson*, for defendants.

SITTING: WISWELL, C. J., WHITEHOUSE, STROUT, SAVAGE, POWERS, PEABODY, JJ.

STROUT, J.　Muddy Brook stream is the outlet of Clearwater Pond in Industry.　Prior to 1860 there was, and still is, a dam at the outlet of the pond, which controls the supply of water for the mills on Muddy Brook stream.　About 450 feet below this dam there was, and now is, a dam across the stream.　At that dam, on the west side of the stream, there was then a grist-mill and starch factory, and later a shovel-handle mill on the site of the starch factory.　Opposite, on the east side of the stream, there was a tannery.　Nearly five hundred feet below these mills there was, and still is, another dam and a saw-mill.　Prior to that time Newman T. Allen and Benjamin Allen owned all the dam, and all the water rights and privileges at the outlet of the pond, and all the land on both sides of the stream used as mill privileges or mill yards, from the outlet of the pond to and including the plaintiff's premises.

October 22, 1860, S. B. Philbrick became the owner of the tannery and tannery lot of about two acres, on the east side of Muddy Brook, by conveyance from the Allen heirs.　The deed bounded the lot by "the easterly side of the stream," thus excluding all common law rights in the stream as riparian proprietors, leaving the whole water power of the stream in the grantor.　But the deed granted to Philbrick "the right to draw water from the upper dam (at outlet of pond) when there is more than three and a half feet of water in the flume, for the use of all tanning purposes," with a limitation as to user when the water in the flume was below three and one-half feet.　The grantee in this deed was required to keep in repair one-eighth of the upper dam (at the pond) and that part of the grist-mill dam east of the wasteway, a clear indication that the parties

contemplated a much larger use of the water power by the grantor than by the grantee.

May 18, 1868, Amos S. Hinkley, who then owned all the water rights at the outlet of the pond, and on the stream, together with the land on both sides, except the tannery lot, conveyed to Oliver and Bryce H. Waugh a parcel of land, which included the lower dam and saw-mill and the mill pond to the same. This dam was nearly five hundred feet below the dam of the grist-mill and shovel-handle factory. The northerly line of this lot was about 250 feet south of and below the grist-mill dam. The plaintiff owns the land and privileges conveyed to the Waughs by Hinkley. The deed granted to Waugh "the right and privilege to draw and use water from Clearwater pond sufficient to carry one wheel in said saw-mill for the purpose of manufacturing timber, boards, shingles, clapboards, laths and pickets, meaning one of the wheels now in the said saw-mill or any other wheel venting or requiring no more water to carry it. Said water to be taken through the dam, flumes and pond of the other mills on the stream above the saw-mill." But he was forbidden to draw water below the depth of four feet above the bottom of the flume, or to draw or use any in the night time.

On November 1, 1900, the defendant had become the owner of the tannery lot, the dam at the outlet of the pond, and all the land on both sides of the stream from the pond to the plaintiff's land, with the mills thereon, and all water rights appertaining thereto, except the right which plaintiff held as derived under the Waugh deed. At the same time the plaintiff owned the land on both sides of the stream south of and below defendant's land, with the right to water as granted in the Waugh deed.

In place of the tannery which formerly stood on the tannery lot, but which had ceased to exist, defendant has a saw-mill which he has operated by water from the pond and his dam next below.

Plaintiff claims that defendant has "diverted, withdrawn and turned aside large quantities of water from his mill and prevented the same from flowing down said stream as it ought to have done," to his detriment. The gravamen of his claim is, that the deed to Philbrick of the tannery lot granted the use of water for tanning

purposes only, and that when the tannery ceased to exist, and the defendant erected a saw-mill in its place, his use of water for that saw-mill was unauthorized.

To arrive at a true construction of the grant of water right in the Philbrick deed, which was "the right to draw water . . . . . for the use of all tanning purposes," it is necessary to view it from the standpoint of the parties at the time. The land conveyed was carefully bounded by the east side of the stream, thus excluding all common law rights to the water as riparian proprietors. The only right to water which Philbrick acquired, was the specific grant above quoted. At that time the grantor had a grist-mill and starch factory on the west side of the stream opposite the tannery lot. While he had no objection to the operation of the tannery, he might well object to a competing mill on that lot, which would quite likely depreciate the value of his mills and lessen their profits. The tannery was then in existence, and of course in the minds of the parties. The grant was "for the use of all tanning purposes," not of sufficient water for such purposes, but limited to that purpose. The language is clear and the intention unmistakeable. It was not used as a measure of power, but a limitation upon its use. *Deshon* v. *Porter*, 38 Maine, 289, is a case very closely analogous. In *Covel* v. *Hart*, 56 Maine, 518, the grant was of "a right to draw water from the saw-mill flume sufficient to carry on the business of tanning in said yard," and it was held to be a measure of power, and not a limitation to a particular use, and "restricted substantially to the amount of water which was sufficient to carry on the business of tanning in the yard, as it was carried on at the time of the date of the deed." But in arriving at that conclusion the court laid stress upon various terms in the deed, indicative of intention, which are not found here. Besides, the language in that case was water "sufficient to carry on" a tanning business, which might be regarded as a measure of power, while the term here is water "for the use of all tanning purposes," which affords a strong indication that the parties had in view the tannery then existing, and not any prospective substituted use. The many cases cited from this and other jurisdictions all turn upon the language of the grant, as water "sufficient for one fulling wheel,"

"sufficient to carry a turning lathe," "water sufficient to drive the factory and machinery attached," "sufficient to carry a water wheel," etc., all evidently and plainly indicating a measure of power rather than designation of use.

In this case we can have no doubt that the grant was limited to tanning purposes, to that "use" only, having special reference to the tannery then existing, and cannot be regarded as a measure of power.

But this construction is not decisive of the rights of the parties to this suit. The grant to Philbrick was of an easement in the land and water rights of the grantor. The latter retained to himself the right to use all the water from his two dams and flowing in the stream, except that specifically granted. The subsequent grant to Waugh of a specific quantity of water, conferred upon him no right as to the prior grant to Philbrick. Waugh could not complain of the use or non use of its easement by the tannery lot.

On November 1, 1900, the defendant was the owner in fee of the dominant and servient estates. He then owned the dams at the pond and at his mills and all the water rights at the pond and on the stream, and the land on both sides of the stream, subject only to the right granted by the Waugh deed, then held by the plaintiff. Such union of title in the defendant extinguished the easement before that attached to the tannery lot. Jones on Easements, § 835 ; *Warren* v. *Blake*, 54 Maine, 276, 89 Am. Dec. 748; *Dority* v. *Dunning*, 78 Maine, 381. Thenceforward the defendant possessed all the common law rights of a riparian proprietor in the water from the pond to plaintiff's land, subject only to his right to draw water as granted by the Waugh deed. Plaintiff owned the land conveyed by the Waugh deed, through which Muddy Brook stream run. Whatever common law rights he had as such riparian owner, if not eliminated by acceptance of the easement granted in the Waugh deed, are unaffected by the use of the tannery lot for a saw-mill. Neither, as holding the secondary easement, can he object to the extinguishment of the first.

As riparian proprietor on both sides of the stream from the pond to plaintiff's land, the defendant is unaffected by the limitation in the grant of the tannery lot, and has the full right of reasonable use of

the water from the pond, modified only by the plaintiff's right to draw water for one wheel from the pond through defendant's flumes, according to the grant in the Waugh deed. If the defendant's substituted use of water for a saw-mill on the tannery lot does not injuriously affect the easement of plaintiff, he cannot complain. So long as defendant runs through his flume sufficient water to run plaintiff's wheel, he receives all that was granted in the Waugh deed. If this was not done, plaintiff had the right to have the gates at defendant's mill or at the pond opened sufficiently to accomplish it. If, in addition, plaintiff had any right of water as riparian proprietor where his land borders on the stream, such right was subject to a reasonable use of the water by the defendant higher up on the stream. Both parties undoubtedly expected defendant to use water for his mills, and he could not be required to shut them down to retain water as a reservoir for plaintiff, but might make such use of the water as did not unreasonably interfere with plaintiff's rights. The plaintiff was not charged with the maintenance of either of the dams owned by defendant, or any part of them. That burden lies upon defendant solely. He, of course, has no right to make such excessive or wasteful use of the water as unreasonably to injure plaintiff's mill.

Applying these principles, the plaintiff does not complain of wasteful use of water by defendant, except as he says, water run over his dam on one day. But on that day defendant's mill had run but a few minutes. The excess of water, if any, resulted from leaky dams — nor does it appear that defendant unreasonably held back the water. The evidence fails to show that plaintiff was deprived of water sufficient for his one wheel by any unreasonable or improper act of the defendant. The plaintiff says that he commenced sawing about the last of March. "Had water enough except the day when I hoisted the gate;" "think I have hoisted three times;" "some of the time he (defendant) accommodated me to run it through the Johnson, (one of defendant's) mills;" "there has been enough water this spring, plenty of it, more than I wanted." The diversion complained of is from November 1, 1900, to March 30, 1901, and yet during this

time plaintiff says he has had water enough.    He apparently has no right to complain.

If, notwithstanding the defendant has operated a saw-mill on the tannery lot, by water from the pond, the plaintiff has been supplied with all the water to which he was entitled. under the grant in the Waugh deed, and no unreasonable use has been made by defendant, he is not injured by the substituted use.    Until he suffers damage therefrom he cannot maintain any action for such use.    No evidence of damage to plaintiff is introduced.    On the contrary, plaintiff says he has had water enough, even more than he wanted, during the period complained of.    He does not. claim that the excess has done him harm, except that he fears he may need the water at some future time, an apprehension that may never ripen into a fact.    It is immaterial to the plaintiff whether defendant used all his water power on the west side of the stream or partly on the east side.

*Judgment for defendant.*